**MARBLED MURRELET (BRACHYRAMPHUS MARMORATUS), Environmental Protection Information Center, Inc., Plaintiffs,**

v.

**PACIFIC LUMBER COMPANY, Defendant.**

No. C-93-1400-LCB.

United States District Court, N.D. California.

Feb. 27, 1995.

Macon Cowles, Susan R. O'Neill, Boulder, CO, Charles S. Crandall, San Diego, CA, Mark P. Harris, Arcata, CA, William A. Rossbach, Missoula, MT, for plaintiffs.

Alson R. Kemp, Jr., Mark H. Penskar, Andrea L. Gross, San Francisco, CA, Frank Shaw Bacik, Ukiah, CA, for defendant.

## MEMORANDUM ORDER INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

BECHTLE, District Judge.

### I. *INTRODUCTION*

Plaintiffs, Environmental Protection Information Center, Inc. ("EPIC") and the marbled murrelet (Brachyramphus marmoratus), a federally-protected species, have brought suit against defendant Pacific Lumber Company ("Pacific Lumber") to permanently enjoin the implementation of Timber Harvest Plan 1–90–237 HUM ("THP–237"), under which Pacific Lumber proposes to harvest a 137 acre portion of the Owl Creek forest, a 440 acre stand of old-growth coastal coniferous forest ("old-growth") located in Humboldt County, California. EPIC contends

that Owl Creek is part of one of only three marbled murrelet nesting habitats remaining in California, and that Pacific Lumber's harvesting of 137 acres of this area will result in a "taking" of the species in violation of § 9(a)(1)(B) of the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. § 1538(a)(1)(B).

On February 2, 1994, U.S. District Judge Fern M. Smith issued a preliminary injunction barring Pacific Lumber from engaging in any logging activities in THP–237 until further order of this court. *Marbled Murrelet v. Babbitt,* No. C–93–1400–FMS, slip op. at 12 (N.D.Cal. Feb. 2, 1994).[1] The court held an eight day non-jury trial between August 15, 1994 and September 8, 1994 to determine whether the marbled murrelet occupies the proposed timber harvest area of THP–237, and, if so, whether Pacific Lumber's implementation of THP–237 will result in a "take" of the species in violation of the ESA. Based on the evidence of record, and the court's findings of fact and conclusions of law as set forth below, the court finds that the marbled murrelet does, in fact, occupy the proposed timber harvest area, and that Pacific Lumber's implementation of THP–237 will sufficiently "harm" and "harass" the marbled murrelet to constitute a "take" of the species in violation of 16 U.S.C. § 1538(a)(1)(B).[2] Pacific Lumber is hereby permanently enjoined from implementing THP–237.

## II. FINDINGS OF FACT

### A. The Parties, Jurisdiction, Venue and Standing

■ 1. EPIC is an "environmental watchdog organization devoted to the protection of threatened and endangered species in the Northern California forest ecosystem." *Marbled Murrelet v. Babbitt,* No. C–93–1400–FMS, slip op. at 1 (N.D.Cal. Sept. 1, 1993). EPIC's 300 members live and work in the redwood region of Northern California. (Lanham, Tr. 8/15/94 at 42, 46.) Many of EPIC's members are committed to protecting the biodiversity of the redwood region. (*Id.* at 55.) In this role, they monitor areas where they believe marbled murrelets are nesting, and attempt to determine what impact logging these areas will have on the marbled murrelet and other old-growth dependent species. (*Id.*) This court has already found that EPIC's members will suffer an "injury in fact" if Pacific Lumber's implementation of THP–237 results in a "take" of the marbled murrelet in violation of the ESA. *Marbled Murrelet v. Babbitt,* No. C–93–1400–FMS, slip op. at 5–9 (N.D.Cal. Sept. 1, 1993) (*citing Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573 n. 8, 112 S.Ct. 2130, 2143 n. 8, 119 L.Ed.2d 351 (1992)). Thus, EPIC has standing to sue under the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(1)(A). *Id.*

■ 2. The marbled murrelet is a rare seabird which nests primarily in old-growth coastal coniferous forests between southeast Alaska and Santa Cruz, California. (Pls.' Ex. 272 at 2.) Effective March 12, 1992, the marbled murrelet was listed as an "endangered species" under the California Endangered Species Act ("CESA"), 14 Cal.Fish &

---

1. This court, on inter-circuit assignment, now presides over the case. The court incorporates Judge Smith's preliminary injunction by reference.

2. The court's ruling follows the Ninth Circuit's holding in *Palila v. Hawaii Dept. of Land and Natural Resources,* 852 F.2d 1106, 1108 (9th Cir. 1988), that a permissible interpretation of the word "harm" in the ESA's definition of the word "take" includes "significant habitat modification or degradation." *See* 50 C.F.R. § 17.3 (1987). *But cf. Sweet Home Chapter of Communities for a Great Oregon v. Babbitt,* 17 F.3d 1463 (D.C.Cir. 1994) (Congress did not intend habitat modification to be included in definition of "harm"), *cert. granted,* —— U.S. ——, 115 S.Ct. 714, 130

L.Ed.2d 621 (1995). Pacific Lumber contends that the D.C. Circuit's holding in *Sweet Home* precludes this court from finding that the harvesting of critical marbled murrelet breeding habitat in Owl Creek, which is privately-owned, would constitute a "take" in violation of the ESA. Pacific Lumber is incorrect. At this time, *Palila,* not *Sweet Home,* is the controlling law in the Ninth Circuit "until and unless changed by the Supreme Court or by the circuit itself." *See Seattle Audubon Society v. Lyons,* 871 F.Supp. 1291, 1313 (D.Wash.1994). *Accord., National Wildlife Federation v. Burlington Northern,* 23 F.3d 1508, 1512 (1994) (reaffirming holding in *Palila* ).

Game Code § 1750, *et seq.*[3]  *See* 14 C.C.R. § 670.5.  Effective September 28, 1992, the marbled murrelet was listed as a "threatened species" under the federal ESA within its range in California, Oregon and Washington.[4] 57 Fed.Reg. 45328 (Oct. 1, 1992); *see also* 50 C.F.R. § 17.11 (1993).  Thus, as a protected species under the ESA, the marbled murrelet has standing to sue "in its own right." *Marbled Murrelet v. Babbitt,* No. C–93– 1400–FMS, slip op. at 9, n. 4 (N.D.Cal. Sept. 1, 1993) (*quoting Palila,* 852 F.2d at 1107.).

3.  Pacific Lumber is a logging company with a base of operations in Scotia, California.  (Herman, Tr. 9/6/94 at 165.)  Pacific Lumber owns and proposes to harvest the portion of the Owl Creek forest covered by THP–237.  (Def's. Exs. 816 and 818.)

4.  The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 16 U.S.C. §§ 1540(c) and 1540(g)(1).

5.  Venue is proper pursuant to 28 U.S.C. § 1391(b).

## B. *The Marbled Murrelet*

6.  The marbled murrelet is a small seabird in the family of alcids (which includes auks, murres and puffins).[5]  (Carter, Tr. 8/15/94 at 58–60; Pls.' Ex. 251 at 1, 7–8.) The marbled murrelet is approximately nine inches in length, it has a short neck and tail, small wings, and a heavy compact body. (Pls.' Ex. 251 at 1, 7–8; Nelson, Tr. 8/16/94 at 53.)  Both adult murrelets and their chicks have "cryptic plumage;" during the breeding season, the adult's plumage is dark brown

and gray with black bars above and a heavily mottled light brown below.  (Pls.' Ex. 251 at 8; Nelson, Tr. 8/16/94 at 22, 53; Carter, Tr. 8/15/94 at 66.)

7.  Like other alcids, the marbled murrelet spends most of its time at sea feeding on small fish.  (Pls.' Ex. 251 at 7–8.)  The marbled murrelet, however, is the only member of the alcid family that nests in trees.  (*Id.* at 1; Carter, Tr. 8/15/94 at 60.)  Within the contiguous United States, the marbled murrelet nests exclusively in old-growth coniferous forests within 30 miles of the northern Pacific coastline.[6]  (Carter, Tr. 8/15/94 at 60– 61, 72; Burkett, Tr. 8/18/94 at 185, 224–26; Pls.' Exs. 223, 224, 251, 270, 304 and 329.) These old-growth forests contain centuries-old redwood and Douglas fir trees which are hundreds of feet tall, with large trunks that can range from two feet to ten feet in diameter.  (Fox, Tr. 9/7/94 at 229–30; Herman, Tr. 9/6/94 at 112, 120.)  Marbled murrelet nest trees generally have a large trunk (more than 32 inches in diameter) and large limb structures that are used as a nest platform. (Nelson, Tr. 8/16/94 at 53.)  Typically, the marbled murrelet chooses a limb at least 150 feet above the forest floor.  (*Id.* at 55.)

8.  Marbled murrelets do not breed until they are several years old, and adults do not necessarily breed every year.  (Pls.' Ex. 251 at 1, 9–10.)  Additionally, the marbled murrelet does not "build" a nest; rather, the female lays a single egg each year in a natural depression on a large horizontal, moss-covered limb of an old-growth redwood or Douglas fir tree.  (*Id.;* Nelson, Tr. 8/16/94

---

3.  The CESA protects endangered species within their habitat in California.  The CESA, however, differs from the ESA in several respects.  It does not provide the same protection as the ESA because it does not include the federal definitions of "harm" or "harass" in its definition of the term "take."  (Moore, Tr. 8/17/94 at 148.)  In fact, unlike the ESA, the CESA is neither interpreted nor explained by any regulations which define key terms used in its provisions.  (Pls.' Ex. 334 at III–2.)  Moreover, the CESA makes no provision for designating or protecting critical habitat for a species, nor does it expressly include habitat modification as a type of prohibited taking.  (*Id.*)

4.  Under the ESA, the term "threatened species" means any species which is likely to become in

danger of extinction within the foreseeable future through all or a significant portion of its range. 16 U.S.C. § 1532.

5.  Alcids are wing-propelled diving seabirds that subsist on small ocean fish.  (Carter, Tr. 8/15/94 at 58–59; Nelson, Tr. 8/16/94 at 18.)

6.  The marbled murrelets' nesting habits were a mystery until relatively recently.  (Nelson, Tr. 8/16/94 at 15; Carter, Tr. 8/15/94 at 58, 67–68.) The first marbled murrelet nest was discovered in 1974.  (Nelson, Tr. 8/16/94 at 13, 53; Carter, Tr. 8/15/94 at 66–68.)  A second nest was not found until 1989.  (Nelson, Tr. 8/16/94 at 28.) Since that time, only 71 nests have been discovered in the Pacific Northwest, of which only nine were in California.  (*Id.* at 25, 90.)

at 21–22; Moore, Tr. 8/17/94 at 156.) After an egg is laid, the male and female incubate the egg, trading off duties on a daily basis. One murrelet remains on the nest while the other is at sea, and the birds exchange places at dawn. (Nelson, Tr. 8/16/94 at 23–25.)

9. Marbled murrelets nest solitarily, rather than in colonies. (*Id.* at 26; Carter, Tr. 8/15/94 at 66; Burkett, Tr. 8/18/94 at 264.) While a forest where marbled murrelets are nesting usually contains more than one such nest, only a single pair of marbled murrelets will nest in any one tree within a particular forest stand. (Nelson, Tr. 8/16/94 at 27, 52.) In addition, marbled murrelets are known to have high "site fidelity;" *i.e.,* the species returns each year to the same forest "stand." [7] (*Id.* at 70–71; Carter, Tr. 8/15/94 at 151; Speich, Tr. 9/8/94 at 63–64.)

10. The marbled murrelet is highly susceptible to predation during its nesting season, which lasts from approximately mid-April until September. (Moore, Tr. 8/17/94 at 155; Pls.' Ex. 251 at 9, 12–13.) Of the marbled murrelet nests which have been discovered, few have achieved nesting success. (Carter, Tr. 8/15/94 at 86; Nelson, Tr. 8/16/94 at 26.) That is, the chick hatched in the nest rarely survives to become a fully-fledged bird. Death of marbled murrelet chicks before fledgling results primarily from attacks by avian predators. (Nelson, Tr. 8/16/94 at 26.) Predators such as ravens, hawks and stellar jays, known as "corvids," are generally considered to be a significant threat to the marbled murrelet. (*Id.* at 26–27; Burkett, Tr. 8/18/94 at 263–64; Moore, Tr. 8/17/94 at 178–79; Speich, Tr. 9/8/94 at 76.) Some experts believe that, even under ideal circumstances, more than 50 percent of marbled murrelet nests are subject to nest predation. (Moore, Tr. 8/17/94 at 180.)

11. Because the marbled murrelet is highly susceptible to predation during the nesting season, the bird has developed very secretive behavior to protect itself and its young. (Carter, Tr. 8/15/94 at 62–63, 65–66.) The marbled murrelet prefers to nest in areas where the foliage is thick enough to protect it from being spotted by avian predators. (Moore, Tr. 8/17/94 at 155.) While on land, the marbled murrelet is nocturnal; it flies primarily in darkness or at very low light levels, at dawn and dusk. (Carter, Tr. 8/15/94 at 66; Nelson, Tr. 8/16/94 at 53.) Additionally, the marbled murrelet flies very fast through the air, at speeds up to sixty miles per hour. (Nelson, Tr. 8/16/94 at 18.)

12. Because the marbled murrelet depends on stealth for its existence, it is "very, very difficult to study and find." (Nelson, Tr. 8/16/94 at 52–53.) In the words of one of Pacific Lumber's expert witnesses, Steven Kerns ("Kerns"): "the murrelet is a bird that is hard to detect at any given bird sites. It is a secretive bird." (Kerns, Tr. 9/7/94 at 22.) "The murrelet basically makes its living by staying out of everything's way." (Moore, Tr. 8/17/94 at 155.)

13. The historical population of the marbled murrelet in California is believed to have been about 60,000. (Pls.' Ex. 251 at 2, 16–17.) Currently, it is believed that approximately 2000 to 5000 marbled murrelets remain in California. (Pls.' Ex. 248 at 1; Speich, Tr. 9/8/94 at 80.) In 1991, the California Department of Fish and Game ("DFG") estimated that the total *breeding* population of the marbled murrelet in California was approximately 1650 to 2000 birds. (Pls.' Ex. 251 at 2, 17–19.)

14. The existing population of the marbled murrelet in the Pacific Northwest is known to be declining rapidly. (Carter, Tr. 8/15/94 at 86–88; Pls.' Exs. 248 and 251.) The two primary reasons for this decline are the bird's very low annual reproductive potential (1 chick per successful breeding pair), which is exacerbated by nest failure due to predation, and the loss of the vast majority of the marbled murrelet's old-growth nesting habitat. (Pls.' Ex. 248 at 1; Carter, Tr. 8/15/94 at 86–90; Burkett, Tr. 8/18/94 at 173; Moore, Tr. 8/17/94 at 105–06.) In California, more than 96 percent of the marbled murrelets' old-growth nesting habitat has been lost to commercial logging during the past 150 years. (Pls.' Exs. 223 and 224; Burkett, Tr.

---

**7.** A "stand" is a contiguous grouping of trees that exhibit characteristics suitable for marbled murrelet nesting. (Moore, Tr. 8/17/94 at 158.)

8/18/94 at 227; Fox, Tr. 9/7/94 at 223; Moore, Tr. 8/17/94 at 105–06.) Pacific Lumber estimates that a total of only 137,000 acres of old-growth remain in the State of California. (Pls.' Ex. 334 at IV–5.) Pacific Lumber owns approximately four percent of this total. (*Id.*)

15. The remaining population of marbled murrelets in California is separated into three clusters, which are closely associated with the three remaining blocks of old-growth in the state. (Pls.' Ex. 251 at 17.) The largest remaining cluster of marbled murrelets in California is located in Del Norte and northern Humboldt Counties in the vicinity of Jedediah Smith State Park and Redwood National Park. (*Id.*) The next largest cluster is located in southern San Mateo and northern Santa Cruz Counties in the vicinity of Portola State Park and Big Basin State Park. (*Id.*) The smallest remaining cluster is located in "an isolated locality" in south central Humboldt County in the vicinity of Grizzly Creek State Park, Humboldt Redwoods State Park and Owl Creek.[8] (*Id.*) The DFG believes that the geographic separation between these three clusters may be substantial enough to prevent movement of individual marbled murrelets between populations.[9] (*Id.*)

16. After the logging of an old-growth forest, the original "cathedral-like" columns of trees do not regenerate for a period of two hundred years. (Fox, Tr. 9/7/94 at 226.) Because of the precarious state of the marbled murrelet population, the destruction of any significant amount of marbled murrelet habitat will result in a high probability that the Northern California population will become extinct. (Carter, Tr. 8/15/94 at 95.)

The DFG's June 1991 "Status Review of the Marbled Murrelet" states "[a]ll remaining old-growth coastal coniferous forest supporting Marbled Murrelets must be protected from any further modification." (Pls.' Ex. 251 at 5, ¶ 4.) Destruction of any additional occupied stands would, therefore, retard the marbled murrelets' recovery. (Carter, Tr. 8/15/94 at 98–101.) As Pacific Lumber's expert witness Steven Speich ("Speich") asserted, "the whole reason for being a marbled murrelet is to reproduce successfully." (Speich, Tr. 9/8/94 at 66.) Successful nesting is critical to the survival of the species, because most of the population is unable to successfully raise young in the nest. (Carter, Tr. 8/15/94 at 173–74.) Unless the marbled murrelet population is kept at a sustainable level, without further loss of habitat, it is very likely that the marbled murrelet will slip toward extinction. (*Id.* at 81–82, 86, 91–96, 174; Pls.' Exs. 270 and 271.)

17. In connection with the marbled murrelets' listing as a "threatened species" under the ESA, the United States Fish and Wildlife Service ("USF & WS") appointed a Marbled Murrelet Recovery Team ("MMRT") to review the conservation needs of the species in California, Oregon and Washington. (Pls.' Ex. 248 at 1.) In a status report dated April 14, 1994, the MMRT concluded that "any reduction in occupied nesting habitat for the Marbled Murrelet would hamper efforts to stabilize the population and eventually recover the species." (*Id.* at 2.) The MMRT recommended that the USF & WS designate all suitable marbled murrelet nesting habitat on Pacific Lumber's lands in Humboldt County, California as "critical habitat" for the marbled murrelet.[10] (*Id.* at 2–3.) The

8. In an attempt to minimize the significance of its logging operations in southern Humboldt County, Pacific Lumber has estimated that only 71 marbled murrelets inhabit the coastal near-shore waters between Eureka and Pillar Point, California during the summer breeding season. (Pls.' Ex. 334, Table V–2; *see also* Carter, Tr. 8/15/94 at 85–86.)

9. According to the DFG's June 1991 "Status Review of the Marbled Murrelet," the remaining marbled murrelet population in California is so fragile that, unless it is allowed to regenerate, the entire population could be eliminated by a single off-shore catastrophic event, such as an oil spill,

from the effects of gill-netting, or from the loss of the murrelets' principal food source during an El Nino-type oceanic event. (Pls.' Ex. 251 at 3.)

10. Under the ESA, "critical habitat" is defined as "the specific areas within the geographical area occupied by the species ... on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection[.]" 16 U.S.C. § 1532(5)(A); 50 C.F.R. § 424.02(d). When the marbled murrelet was listed as a "threatened species" on September 28, 1992, the USF & WS lacked sufficient information to perform the required analyses of

MMRT concluded that "[t]hese areas are the only available nesting habitat for the population of Marbled Murrelets that occur at-sea in the area of Cape Mendocino." (*Id.* at 3.)

### C. *Owl Creek and THP–237*

18. The Owl Creek forest is an isolated 440 acre stand of contiguous old-growth redwood and Douglas fir trees located 22 miles inland from the Pacific coast in south central Humboldt County. (Pls.' Ex. 329; Kerns, Tr. 9/7/94 at 57; Def's. Exs. 812 and 813.) The Owl Creek forest is completely surrounded by previously harvested clear cut and second-growth forests for four to five miles in all directions. (Pls.' Ex. 329; Moore, Tr. 8/17/94 at 105–06; Burkett, Tr. 8/18/94 at 265.) The nearest stand of old-growth to Owl Creek is Allen Creek, which is located some four miles to the west. (Moore, Tr. 8/17/94 at 105–06.)

19. THP–237 is a 237 acre, kidney-shaped segment of the Owl Creek forest. (Def's. Ex. 816.) Within THP–237, the forest consists of old-growth redwood and Douglas fir trees which are between two and eight feet in diameter at breast height ("d.b.h."), in excess of 150 feet tall, with canopy closure ranging from 50 to 100 percent. (Pls.' Exs. 292–M, 329, 334, 335, 336 and 337; Def's. Exs. 812

and 813.) The old-growth redwood and Douglas fir trees in THP–237 range in age from 150 to more than 500 years old. (Herman, Tr. 9/6/94 at 109.)

20. Because of the age and size of its old-growth redwood and Douglas fir trees, the high degree of canopy closure, the existence of suitable nest platforms, and its proximity to the ocean, the Owl Creek stand, including THP–237, is suitable nesting habitat for the marbled murrelet. (Pls.' Ex. 248 at 2–3; Pls.' Ex. 298; Moore, Tr. 8/17/94 at 158; Nelson, Tr. 8/16/94 at 55; Burkett, Tr. 8/18/94 at 185.) In fact, Pacific Lumber has ranked THP–237 as some of the most suitable and important nesting habitat for the marbled murrelet on the 196,000 acres of land owned by the company in Humboldt County, California.[11] (Pls.' Exs. 329 and 334.)

21. On April 11, 1990, Pacific Lumber submitted THP–237 to the California Department of Forestry ("CDF") for approval.[12] (Def's. Ex. 816.) Initially, the CDF refused to approve Pacific Lumber's proposal for THP–237 because the proposed harvest plan did not provide sufficient mitigation measures to ensure that a "take" of the marbled murrelet would not occur in violation of the CESA.[13] (Def's. Ex. 817.)

the environmental and economic impact of a critical habitat designation for the species. 57 Fed.Reg. 45328, 45336 (Oct. 1, 1992). At the time, the USF & WS stated that it needed to "carefully study all known occupied sites an other suitable areas, in order to determine which physical or biological features are in fact essential to the conservation of the murrelet." (*Id.*) The MMRT is part of this effort.

**11.** The Secretary of the Interior may permit the taking of a protected species "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). Such takings cannot occur, however, until an applicant submits, and receives approval of, a habitat conservation plan as outlined in 16 U.S.C. § 1539(a)(2). On October 11, 1993, Pacific Lumber submitted a draft habitat conservation plan ("HCP") for the preservation of the marbled murrelet on its property in Humboldt County to the DFG and USF & WS in connection with the company's application for an "incidental take" permit for the marbled murrelet under § 1539(a)(2). (Pls.' Ex. 334.) Pacific Lumber's HCP contains a numerical ranking system that the company devised "as a means to quantitatively evaluate the potential suitability

and importance of areas of timber [on Pacific Lumber property] for nesting marbled murrelets." (*Id.* at VII–2.) The suitability of Pacific Lumber's property as nesting habitat for the marbled murrelet is ranked on a scale from 0 to 5, with 5 being the most suitable and important habitat based on the size of the trees in the stand and the density of canopy closure. (*Id.*) Pacific Lumber has developed a map of its property applying the suitability rankings in the HCP. (Pls.' Ex. 329.) On this map, the proposed harvest area of THP–237 is ranked 5, while the proposed retention area is ranked 4. (*Id.*)

**12.** An approved timber harvest plan is required by the State of California as a prerequisite to the conduct of commercial timber operations within the state. (Miller, Tr. 8/16/94 at 152.)

**13.** When THP–237 was originally filed with the CDF, the marbled murrelet was not yet protected by either state or federal law. However, the California Fish and Game Commission had already received a petition requesting state listing of the marbled murrelet as a threatened species under CESA, and the DFG was in the process of conducting a 12 month review of the species'

22. On March 13, 1992, the California Board of Forestry overruled the CDF and approved THP–237. (*Id.*) The Board of Forestry's approval, however, was made contingent upon Pacific Lumber's conducting marbled murrelet surveys in Owl Creek in compliance with the Pacific Seabird Group's "Methods for Surveying Marbled Murrelets at Inland Forested Sites" ("PSG Protocol"), and Pacific Lumber's sharing of its survey results with the DFG to ensure that no "take" of the marbled murrelet would occur. (*Id.* at 3–4.) According to the Board of Forestry's Findings for Approval of THP–237, "[o]perations may not commence until the surveys made [as] a condition of this approval are completed and the information [is] provide[d] to CDF and DFG." (*Id.* at 10.)

23. After conversations with representatives of the CDF and DFG at THP–237 in August 1992, Pacific. Lumber agreed to amend THP–237 to set aside certain mitigation zones for the marbled murrelet, and to refrain from harvesting THP–237 during the marbled murrelets' nesting season. (Def's. Ex. 832.)

24. On November 25, 1992, Pacific Lumber recorded a "minor amendment" to THP–237. which set aside three areas of THP–237 from logging for long as the marbled murrelet continues to be listed as a threatened or endangered species under the state or federal ESA, or until a marbled murrelet management plan, such as a habitat conservation plan under 16 U.S.C. § 1539(a)(2), is approved for all of Pacific Lumber's lands. (Def's. Ex. 833; Herman, Tr. 9/6/94 at 152; Speich, Tr. 9/8/94 at 145.) The amended

THP–237 contains an 83 acre "retention area" in the southwestern portion of the stand, which will not be harvested during the specified period of time; 23 acres of "marbled murrelet mitigation zones," which will not be cut at all; and 137 acres designated as the "harvest area," of which 40 to 60 percent of the trees will be harvested immediately.[14] (Herman, Tr. 9/6/94 at 118–19; Def's. Ex. 818.)

25. Pacific Lumber has proposed a "modified selection cut" for THP–237. (Moore, Tr. 8/17/94 at 166–67.) This is not an outright clear cut, but rather a two-step clear cut. (*Id.*) The initial cut will take the largest old-growth trees in the harvest area. (*Id.*) Within ten years, Pacific Lumber will re-enter the stand and harvest the remaining old-growth. (*Id.;* Pls.' Ex. 334 at II–3.)

### D. *The PSG Protocol*

26. The Pacific Seabird Group ("PSG") is a professional scientific organization which has taken the lead role in coordinating and promoting research on marbled murrelets, and in providing researchers and land managers with standardized techniques to determine marbled murrelet use of inland forested sites. (Pls.' Ex. 272 at 4.) In 1990, the PSG developed its protocol for studying marbled murrelets to assist wildlife biologists by providing guidance to: (a) determine the presence or probable absence of marbled murrelets in a forested stand; (b) help evaluate how marbled murrelets are using these stands; (c) identify the geographic distribution of the marbled murrelet; and (d) provide consistency for the long-term monitoring of the murrelets' activity levels.[15] (Pls.'

---

status in accordance with § 2074.6 of CESA. (Pls.' Ex. 251 at 7.)

**14.** Defendant's Exhibit 818 is a map of THP–237, as amended.

**15.** The PSG Protocol is the generally accepted scientific methodology employed to determine whether marbled murrelets are located in, or making use of, a particular inland forested site for nesting purposes. (Nelson, Tr. 8/16/94 at 27–28.) The PSG Protocol has been adopted for use by the United States Forest Service, the United States Bureau of Land Management, and the state fish and wildlife agencies of Washington, Oregon and California. (*Id.* at 29, 32–34; Pls.'

Exs. 272, 273, 274 and 277.) In addition, on March 5, 1992, the California Board of Forestry adopted the PSG Protocol for use by CDF and DFG to determine whether a proposed timber harvest plan will result in a "take" of a marbled murrelet where there is evidence of an active marbled murrelet site in or adjacent to the THP area, or where there is evidence of a potential impact to a marbled murrelet from the proposed logging operations. 14 C.C.R. §§ 919.11 and 1036.1. According to Ken Moore ("Moore"), a wildlife biologist with the California DFG, the DFG believes that the PSG Protocol "is the best thing out there that anybody has been able to produce that will give the highest probability to find marbled murrelets in any given inland site."

Ex. 277 at 2.) The PSG Protocol is based on the best available information on marbled murrelet biology. (*Id.* at 1.) The protocol is updated annually as new information about the marbled murrelet becomes available.[16] (*Id.* at 1–2.)

27. The PSG Protocol was not designed specifically to find murrelet nests, and the failure to find nests in an area does not rule out the probability that marbled murrelets are nesting within a stand.[17] (Nelson, Tr. 8/16/94 at 54–55.) Instead, the PSG Protocol classifies certain observed behaviors to determine the "presence" of marbled murrelets in a stand of "potential habitat," or to determine whether a particular stand is "occupied" by marbled murrelets.[18] (Pls.' Ex. 277 at 2.)

28. The unit of measure under the PSG Protocol is the "detection" of single bird or flock. (*Id.* at 4.) The PSG Protocol defines a "detection" as "the sighting or hearing of one or more birds acting in a similar manner." (*Id.*) For example, if a surveyor sees or hears a single marbled murrelet circling overhead for three minutes, the protocol states that this should be recorded as a single detection. (*Id.*) If the surveyor loses contact with the bird and then hears a marbled murrelet calling from an unexpected direction, this should be recorded as two detections. (*Id.*) When a flock of birds is observed splitting into two groups, this should be recorded as one detection (*Id.*) If two flocks of birds are observed merging into

one, this should be recorded as two detections. (*Id.*)

29. The PSG Protocol recommends that marbled murrelet "surveys" take place at regular intervals during the murrelets' breeding season, which generally occurs between mid-April and early August of each year.[19] (Nelson, Tr. 8/16/94 at 28; Pls.' Exs. 272, 273, 274 and 277.) According to the protocol, marbled murrelet detectability at inland sites in California appears to have a pre-peak level of moderate intensity during the spring (possibly during incubation), and a peak level of high activity during the last three weeks of July (possibly during the chick period). (Pls.' Ex. 272 at 6; Pls.' Ex. 273 at 5; Pls.' Ex. 274 at 5; Pls.' Ex. 277 at 5.) Detections tend to decrease markedly in August, presumably because the young marbled murrelets are undergoing a flightless molt at sea. (Pls.' Ex. 272 at 6; Pls.' Ex. 273 at 5; Pls.' Ex. 274 at 5; Pls.' Ex. 277 at 5.)

30. During a survey, individual surveyors are placed at various observation stations which are arranged in advance according to factors sets forth in the protocol. (Nelson, Tr. 8/16/94 at 29.) Since marbled murrelets are rarely seen by observers (75 to 95 percent of all detections in California are audible detections), the PSG Protocol recommends that surveyors should avoid placing survey stations near loud noise sources, such as creeks or busy roads. (Pls.' Ex. 272 at 6; Pls.' Ex. 273 at 6; Pls.' Ex. 277 at 15.) The PSG Protocol also recommends that surveys should not be conducted during rainy or

(Moore, Tr. 8/17/94 at 135.) Given the PSG Protocol's nearly universal acceptance by the scientific community and public agencies charged with enforcing the ESA, the court finds that the PSG Protocol fulfills the requirements set forth by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See also Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311 (9th Cir.1995).

16. The court will refer to the PSG's 1991, 1992, 1993 and 1994 protocols collectively as the "PSG Protocol." Where specific references to a particular protocol are necessary, the court will include the year of the protocol.

17. In fact, because marbled murrelet nests are so difficult to find, their nests have been found in only a small percentage of the forests classified

as "occupied" by the PSG Protocol. (Nelson, Tr. 8/16/94 at 54.)

18. The PSG Protocol defines "potential habitat" as: (1) mature and old-growth coniferous forests; and (2) younger coniferous forests that have deformations or structures suitable for nesting. (Pls.' Ex. 277 at 3.) The second part of this definition was added in 1994 after marbled murrelets were observed in younger coniferous forests (40–80 years old) in Washington and Oregon. (*Id.*)

19. The PSG Protocol defines a "survey" as "the process of determining marbled murrelet presence, absence, and occupancy of a stand by conducting survey visits." (Pls.' Ex. 277 at 3.) A "survey visit" is a single two hour survey completed by one surveyor at one survey station. (*Id.*)

windy conditions when it becomes difficult to hear the birds, or in heavy fog which limits visibility. (Pls.' Ex. 272 at 6; Pls.' Ex. 277 at 15.) However, surveys can be conducted on overcast days with light rain or moderate fog, because murrelets tend to call for longer periods and at higher rates during these conditions. (Pls.' Ex. 277 at 15.) Finally, the PSG Protocol recommends that surveys stations be located in areas that have an unobstructed view of the sky, and a maximum view of the canopy or stand being surveyed, because it is much easier to see the silhouette of a marbled murrelet flying directly overhead against the light-colored sky than it is to see the bird while looking down onto a dark background from the top of a ridge or a high point. (Pls.' Ex. 272 at 6; Pls.' Ex. 273 at 6; Pls.' Ex. 274 at 6; Pls.' Ex. 277 at 6; Pls.' Ex. 291.)

31. Marbled murrelet surveys should begin 45 minutes before the official sunrise (as determined by the Nautical Almanac) and last until either 75 minutes after the official sunrise or for 15 minutes after the last detection, whichever is longer. (Pls.' Ex. 272 at 6; Pls.' Ex. 273 at 6; Pls.' Ex. 274 at 5; Pls.' Ex. 277 at 6; Nelson, Tr. 8/16/94 at 29.) According to the PSG Protocol, there must be a minimum of six and a maximum of 30 days between survey visits at a particular station. (Pls.' Ex. 272 at 6; Pls.' Ex. 273 at 7; Pls.' Ex. 274 at 5; Pls.' Ex. 277 at 5.) At least two surveys must be conducted at each survey site after July 1, with at least one of these surveys conducted during the peak nesting season. (Pls.' Ex. 277 at 5.)

32. Marbled murrelet surveys are conducted by surveyors certified through a training process approved by the State of California. (Nelson, Tr. 8/16/94 at 79.) Surveyors are taught to record each marbled murrelet detection, whether auditory or visual, on a standardized data sheet. (*Id.* at 30.) Surveyors are not required to be 100 percent

certain that they have detected a marbled murrelet to note a detection; rather, they are trained to record data whenever they think they may have detected a marbled murrelet. (*Id.* at 72; Moore, Tr. 8/17/94 at 186.)

33. Auditory detections include marbled murrelet vocalizations, such as detections of the bird's distinctive "keer" calls, wing beats, and "jet" sounds. (Nelson, Tr. 8/16/94 at 73.) A single keer call is important and should be noted by the surveyor. (*Id.* at 134–35; Moore, Tr. 8/17/94 at 185–86.) The sound of wing beats is made when marbled murrelets are coming into a nest. (Nelson, Tr. 8/16/94 at 73.) "Jet" sounds, which are made by a murrelet doing a "jet dive," or steep dive, have been made above known nest trees, and generally end below the tree canopy. (*Id.*)

34. According to the PSG Protocol, the "presence" of marbled murrelets can be determined upon the completion of four surveys per year for two consecutive years, where murrelets have been detected but instances of "occupied behavior," or observations of subcanopy behaviors in a stand, have not been observed.[20] (Pls.' Ex. 277 at 12.) The "absence" of marbled murrelets from a particular stand cannot be determined unless the number of surveys specified in the protocol are conducted for two consecutive years, and no birds are seen or heard. (Nelson, Tr. 8/16/94 at 40–41.)

35. Observations of "occupied behavior" indicate that marbled murrelets are probably using a stand for nesting purposes.[21] (*Id.* at 40.) The types of subcanopy behavior classified as "occupied behavior" include detections of marbled murrelets: (a) flying through, into, or out of the forest canopy; (b) landing in trees; (c) calling from a stationary location; and (d) circling below the canopy height.[22] (Pls.' Ex. 277 at 13.) Circling above the canopy is also common at "occupied" sites, however, the 1994 PSG Protocol

---

**20.** The 1993 PSG Protocol notes that "occupied behaviors" have been recorded in only three percent of the closed canopy sites that have been surveyed. (Pls.' Ex. 274 at 11–12.)

**21.** According to the PSG Protocol, "[s]ubcanopy behaviors in a stand, while not necessarily indicating nesting, means either nesting could occur

at some time, or the stand could be used for purposes other than nesting that are essential to the life history of the bird." (Pls.' Ex. 277 at 13.)

**22.** "Canopy height" is defined as the height of the tallest trees that can be seen from a survey station. (Nelson, Tr. 8/16/94 at 48.)

recommends following up a single observation of circling above the canopy with additional surveys. (*Id.*)

36. Because marbled murrelets are so difficult to detect, and because studies have shown that "occupied behavior" is associated with probable nesting, a single observation of "occupied behavior" under the PSG Protocol is enough to classify a suitable stand of marbled murrelet habitat as being "occupied." (Nelson, Tr. 8/16/94 at 52.) Thus, even if only one instance of "occupied behavior" is noted during 300 surveys, a forest will be considered a probable marbled murrelet nest stand. (*Id.* at 52–53.)

### E. Survey Efforts and Logging Operations at THP–237

#### 1. 1990

37. Pacific Lumber did not begin formally surveying for marbled murrelets in Owl Creek until August of 1991; however, while surveying for spotted owls on August 8, 1990, Pacific Lumber's expert witness, Steven Kerns, observed what he believed to be a marbled murrelet fly directly into the proposed harvest area of THP–237 at a height of just ten feet. (Kerns, Tr. 9/7/94 at 128–30; Pls.' Ex. 307.) Six minutes later, Kerns heard another marbled murrelet's distinctive wing beats as the bird flew directly overhead, but he did not see the bird. (Kerns, Tr. 9/7/94 at 130.) Kern's noted at the time, however, that these observations could not be confirmed as detections of marbled murrelets. (Pls.' Ex. 307.)

#### 2. 1991

38. On August 7, 1991, Pacific Lumber's employees conducted four, two-hour surveys

for marbled murrelets at four stations in THP–237, but made no detections. (Kerns, Tr. 9/7/94 at 16; Def's. Ex. 840.) No further surveys were conducted in Owl Creek in 1991.

#### 3. 1992

39. In April 1992, shortly after the California Board of Forestry's conditional approval of THP–237 and California's listing of the marbled murrelet as an endangered species, Pacific Lumber began conducting marbled murrelet surveys at 19 numerically designated stations in Owl Creek. (Def's. Ex. 829.) The location of each of the 19 survey stations was selected by Pacific Lumber. (Kerns, Tr. 9/7/94 at 11.) Although the 1992 PSG Protocol recommends that surveyors establish a minimum of one survey station for every 30 acres of habitat, Pacific Lumber placed only four of its 19 survey stations in the 160 acre section of THP–237 containing the proposed harvest area and the marbled murrelet mitigation zones.[23] (Pls.' Ex. 273 at 6; Kerns, Tr. 9/7/94 at 14; Def's. Ex. 841.)

40. During the 1992 survey season, marbled murrelet surveys at THP–237 were conducted by a combination of Pacific Lumber employees, who were performing these surveys in addition to their regular duties, and local wildlife biology students or college graduates who were in need of summer employment.[24] (Kerns, Tr. 9/7/94 at 179–81.) Pacific Lumber retained Wildlands Resource Managers ("WRM"), and Natural Resource Management Corporation ("NRM"), to provide the additional marbled murrelet surveyors.[25] (Herman, Tr. 9/6/94 at 229–30; Miller, Tr. 8/16/94 at 157–58.)

---

23. Stations 1 through 9 extend from the northern boundary of THP–237 through the Owl Creek forest to a point almost one mile north. (Def's. Ex. 841.) Stations 10, 11, 13 and 14 are located in the proposed harvest area. (*Id.*) Stations 15, 16, 17, 18 and 19 are located to the south of THP–237. (*Id.*) Stations 12 and 16 are located just outside the western edge of THP–237 in an area that has previously been harvested. (*Id.*; Pls.' Ex. 292.) A map of Pacific Lumber's survey stations is attached as Appendix A.

24. All of the surveyors were certified by the State of California as qualified to perform marbled murrelet surveys. (Kerns, Tr. 9/7/94 at 23–24.) Pacific Lumber's employees became certified as

marbled murrelet observers "because the company asked us to." (Beck, Tr. 8/16/94 at 204–05.)

25. WRM is a proprietorship owned by Pacific Lumber's expert witness, Steven Kerns, and his wife. (Kerns, Tr. 9/7/94 at 167.) Although Kerns was proffered by Pacific Lumber as an expert on the marbled murrelet, he does not have either a masters or doctorate degree in biology (he has an undergraduate degree in anthropology and biology), he never observed a marbled murrelet until 1988, and he did not become a certified marbled murrelet surveyor until 1993. (*Id.* at 118.) Moreover, all of Kerns' marbled murrelet research has been conducted exclusively for Pacific Lumber. (*Id.* at 118–19.) Since 1990,

41. Pacific Lumber directed when, where and how the marbled murrelet surveys in THP–237 were to be taken by WRM and NRM. (Kerns, Tr. 9/7/94 at 134.) Pacific Lumber's Chief of Forestry, Ray Miller ("Miller"), was put in charge of the marbled murrelet surveys, and he managed the surveys "as part of managing our timber[.]" (Miller, Tr. 8/16/94 at 151, 162–63.) Pacific Lumber instructed its surveyors not to record a marbled murrelet detection unless they were "100 percent" certain that they had actually observed a murrelet. (*Id.* at 185–86.) Additionally, Pacific Lumber's surveyors were instructed not to record a detection if they heard only one "keer" call, or if they heard the marbled murrelet's distinctive wing beats. (Beck, Tr. 8/16/94 at 205; Penney, Tr. 8/18/94 at 111–12.)

42. Despite these and other restrictions which deviated from the PSG Protocol, during 14 days of surveying between April 17 and June 16, 1992, Pacific Lumber's surveyors recorded 70 detections of marbled murrelets at numerous locations in and around THP–237, including 16 detections of marbled murrelets in the proposed harvest area itself. (Pls.' Exs. 94, 292 and 293; Rodgers, Tr. 8/16/94 at 234, 242; Moore, Tr. 8/17/94 at 151–52.) Without any further examination, this significant number of detections during the pre-peak season for marbled murrelet activity would at least indicate the "presence" of marbled murrelets in THP–237. (Pls.' Ex. 273 at 11; Pls.' Ex. 277 at 14.) However, further examination reveals that several of these detections are indicative of "occupied behavior" as defined by the PSG Protocol.

43. At least 11 of the 70 detections of marbled murrelets at Owl Creek, or 16 percent, were visual detections. (Pls.' Ex. 292.) This is significant because nearly 75 to 95 percent of all marbled murrelet detections in

California are audible detections. (Pls.' Ex. 273 at 6; Pls.' Ex. 277 at 6.) Moreover, the significance of these detections is enhanced because many of the surveys taken during this period were conducted in less than optimal weather conditions. Pacific Lumber's surveyors recorded 100 percent cloud cover at some or all of the survey stations in Owl Creek on 12 of the 14 days when surveys were conducted; fog was recorded at some or all of the survey stations on 11 of the 14 days; and heavy fog and rain were recorded on six of the 14 days. (Pls.' Ex. 292.) In fact, all but one of the visual detections were recorded on days with 100 percent cloud cover, and ten visual detections were recorded on days with rain and fog. (*Id.*)

44. On April 29, 1992, WRM surveyor James Denison ("Denison") recorded nine detections, including five visual detections, of 16 marbled murrelets flying over Station 16, which is located along a logging road at the southwestern edge of the Owl Creek forest, adjacent to the proposed retention area of THP–237. (Pls.' Ex. 292; Def.'s Ex. 841.) Some of the birds were observed flying west to east or north to northeast, into or above the Owl Creek stand, but the majority of the birds were observed flying silently in a southerly direction through or above the proposed retention area. (Pls.' Ex. 292.) Denison recorded the height of the birds as "90+"; however, he did not indicate a unit of measure (feet or meters). (*Id.*) Depending on whether the birds were flying at a height of 90 feet or 90 meters, Denison's detections could be classified as "subcanopy" flight, or "occupied behavior" in accordance with the PSG Protocol. (Pls.' Ex. 277 at 13.) In any event, Denison's detections are important because of the number of marbled murrelets that he detected, given the scarcity of the species, and the isolation of the Owl Creek stand from other suitable nesting habitat.[26]

Kerns' firm, WRM, has been paid $942,000.00 to conduct marbled murrelet research for Pacific Lumber. (Tr. 9/8/94 at 161–62.) Additionally, WRM is given the use of a house in Pacific Lumber's company town, Scotia, California virtually free of charge. (Herman, Tr. 9/6/94 at 165–66; Kerns, Tr. 9/6/94 at 243.) When WRM personnel attend professional conferences, Pacific Lumber pays all of their travel costs. (Kerns, Tr. 9/7/94 at 164–65.)

26. Station 16 was the only station surveyed in Owl Creek on April 29, 1992. If more stations had been surveyed on this date, it is likely that more information would be available about the behavior of the 16 murrelets detected by Denison, and other murrelets that may have been present in the Owl Creek stand on that day.

45. On April 30, 1992, Denison observed three marbled murrelets flying at a height of 25 meters above Station 15, which is located adjacent to THP–237 on the southeastern edge of the proposed harvest area. (Denison, Tr. 9/8/94 at 19, 28; Kerns, Tr. 9/7/94 at 14; Pls.' Ex. 284; Chinnici, Tr. 8/17/94 at 37.) According to Denison, the murrelets flew toward him from the west and turned south. (Denison, Tr. 9/8/94 at 15.) Thus, the marbled murrelets flew either directly out of, or adjacent to, the proposed harvest area of THP–237. Pacific Lumber's expert witness later characterized the birds as flying "just below top of tree" and noted, "[t]he Protocol states that this observation is a fly through the canopy, indicating an activity site." (Kerns, Tr. 9/7/94 at 139, 185.) As such, Denison's detection constitutes an observance of "occupied behavior" under the PSG Protocol, signifying that the proposed harvest area of THP–237 is a probable marbled murrelet nest stand. (Pls.' Ex. 286.)

46. On May 1, 1992, a marbled murrelet was observed circling above the canopy at Station 17, which is adjacent to the southwestern portion of the Owl Creek stand, between the proposed retention area and the proposed harvest area of THP–237. (Pls.' Ex. 292.) According to the surveyor, Mark Rodgers ("Rodgers"), the marbled murrelet was flying at a height of 300 feet, from the northeast (the direction of the proposed harvest area) to the southeast. (*Id.*) According to the 1992 PSG Protocol, which Pacific Lumber was supposed to be operating under at the time, circling above the canopy of a stand of suitable habitat, or above a stand adjacent to suitable habitat, is "an extremely strong indication of an occupied site." (Pls.' Ex. 273 at 10.) The current PSG Protocol states that circling above the canopy is common over nest stands and occupied stands; therefore, it indicates possible occupancy of a stand. (Pls.' Ex. 277 at 13.) The 1994 Protocol recommends increasing survey efforts in stands where circling is observed. (*Id.*) Af-

ter Rodgers' observation of circling on May 1, 1992, however, there was a three week lapse in Pacific Lumber's surveys. (Pls.' Ex. 292.)

47. In addition to the 11 visual detections recorded at Owl Creek between April 17 and June 16, 1992, Pacific Lumber's surveyors recorded 59 audible detections of marbled murrelets during the same period. (Pls.' Ex. 292.) [27] Many of these audible detections are significant because, like the visual detections, they were recorded on days with less than optimal weather conditions, and some of these detections indicate behaviors which are classified as "occupied behaviors."

48. On April 30, 1992, a day which was plagued by heavy rain, wind and fog, Pacific Lumber's surveyors recorded 17 audible detections of marbled murrelets at seven different survey stations in Owl Creek, including three of the four survey stations in the proposed harvest area of THP–237. (Pls.' Ex. 292.) At Stations 10 and 14, which are located near the center of the proposed harvest area, two surveyors recorded nine audible detections of marbled murrelets within 50 to 150 meters of their stations. (Pls.' Exs. 292 and 292–T.) Neither surveyor recorded a visual detection (both surveyors noted that heavy fog and rain had a negative impact on their survey efforts); however, their audible detections are significant because they suggest "occupied behavior." At Station 10, NRM surveyor Sean McAllister ("McAllister") recorded two audible detections of marbled murrelets engaging in unknown behavior at a height of 50 meters, which is well below the canopy level of 75 meters. (Pls.' Ex. 292; Pls.' Ex. 298 at 4.) This suggests that marbled murrelets were either flying below the canopy level or nesting in the subcanopy, both of which are "occupied behaviors." (Pls.' Ex. 298 at 4; Pls.' Ex. 277 at 13.) Similarly, at Station 14, NRM surveyor Dirk Embree ("Embree") recorded seven audible detections of marbled murrelets within 50 to 100 meters of his position. (Pls.' Ex.

---

27. Plaintiffs' Exhibit 292 is a compilation of the original survey data sheets from the 1992 survey season. Some, but not all, of the data sheets in Plaintiffs' Exhibit 292 are also designated alphabetically. Wherever possible, the court will refer to a particular survey data sheet by its numerical

and alphabetical designation. If the data sheet does not have an alphabetical designation, the court will refer to the survey sheet as Plaintiffs' Exhibit 292, but the date of the survey and the survey station also will be referenced.

292–T.) Embree recorded three separate detections of marbled murrelets calling from the same direction, due north, at a distance of 50 to 100 meters. (*Id.*) Embree did not, however, record a departure direction for the birds, indicating that the marbled murrelets were calling from a stationary location in the stand, which, according to the PSG Protocol, is "very rare" and indicates "occupied behavior" in the heart of the proposed harvest area. (Pls.' Ex. 277 at 13.)

49. On May 1, 1992, Denison recorded two audible detections of three marbled murrelets vocalizing at Station 18, which is located immediately to the south of the proposed retention area of THP–237. (Pls.' Ex. 292; Def's. Ex. 841.) Denison indicated that the birds were flying at a height of only 20 meters from the northwest to the northeast (into the stand), and from the northeast to the east (out of the stand). (Pls.' Ex. 292.) Denison's detections indicate that the marbled murrelets were accessing either the proposed retention area or the proposed harvest area to the northeast, which, according to the PSG Protocol, is evidence of "occupied behavior." (Pls.' Ex. 277 at 13.)

50. On June 8, 1992, WRM surveyor David Fortna ("Fortna") recorded a marbled murrelet "jet sound" at Station 17.[28] (Miller, Tr. 8/16/94 at 167.) A "jet sound" is a distinctive sound that a marbled murrelet makes when it "jet dives" from a high altitude into a nest tree. (Nelson, Tr. 8/16/94 at 73.) Flying into the canopy or a nest tree is classified as an "occupied behavior" by the PSG Protocol. (Pls.' Ex. 277 at 13.) In fact, observations of marbled murrelets flying into a nest tree are considered to be so important that the PSG Protocol recommends that they be reported immediately to interested scientists and responsible wildlife agencies. (*Id.* at 15.) Pacific Lumber, however, never reported Fortna's detection to anyone.[29]

51. In accordance with the Board of Forestry's mandate, Pacific Lumber was supposed to be operating under the most current PSG Protocol during the 1992 survey season. The 1992 PSG Protocol recommends that marbled murrelet surveys be conducted for a minimum of two consecutive years to establish "presence" or "absence" of marbled murrelets from a particular site, unless the site is determined to be *occupied* with fewer survey visits. (Pls.' Ex. 273 at 11.) It also identifies mid-summer (the month of July) as the peak period for marbled murrelet detectability in California, and it recommends that at least two surveys be conducted during this period, with at least one survey occurring after July 1. (*Id.* at 5.) Nevertheless, Pacific Lumber ignored both the PSG Protocol and the Board of Forestry's mandate by terminating its marbled murrelet surveys at THP–237 after June 16, 1992.

52. On Thursday, June 18, 1992, Miller transmitted a letter to Ken Moore at the DFG which summarized the pre-peak survey data from ten of Pacific Lumber's 19 survey stations in Owl Creek.[30] (Miller, Tr. 8/17/94

28. The significance of Fortna's "jet sound" detection is not reduced because he did not see a marbled murrelet. As previously noted, very few marbled murrelet detections in California are visual detections. Also, several Pacific Lumber surveyors indicated that June 8, 1992 was a day with 100 percent cloud cover and heavy fog. One surveyor even indicated that the fog "cut what visibility there was down to nothing." (Pls.' Ex. 292–P.)

29. In fact, Fortna's original "jet sound" survey sheet is no longer in existence. Pacific Lumber's Chief of Forestry, Ray Miller, testified at the trial that Fortna's original survey sheet was "lost." (Miller, Tr. 8/16/94 at 168.) Miller replaced the original "jet sound" survey sheet with another survey sheet that he personally filled out, except Miller changed the new survey sheet to indicate "No Detections." (*Id.* at 165–66; Pls.' Ex. 41.) On the second day of trial, Pacific Lumber produced a copy of a survey data sheet for Station 17 on June 8, 1992 which indicates "No Detections;" however, somebody has written: "This ain't my writing!" underneath the words "No Detections." (Pls.' Ex. 292–Q.)

30. Moore is one of the DFG biologists responsible for determining whether a "take" of a protected species will occur during the implementation of a proposed timber harvest plan. During the trial, Moore testified that it was customary for Pacific Lumber to submit wildlife survey data, a map of survey stations, an aerial photograph of the affected timber harvest plan area, along with the narrative summary of survey results to the DFG, and for the DFG and Pacific Lumber to consult about the wildlife survey results before the DFG would approve timber harvest operations. (Moore, Tr. 8/17/94 at 124–28.) In this instance, Miller's letter did not enclose either survey data sheets or aerial photographs of

at 171–72, 176; Pls.' Ex. 51.) Miller's letter stated:

As you will note from review of the data, no activity sites were found to exist anywhere within or adjacent to the plan area. Since there is no evidence that the THP area contains an active murrelet site or possesses a potential impact to a murrelet as provided in 14 CCR 1036.1 [sic], additional consultation with Fish and Game is not necessary, and timber operations will be commenced.

(Pls.' Ex. 51.)

53. On the following day, Friday, June 19, 1992, before Moore even had a chance to review Miller's letter, Pacific Lumber began harvesting operations in THP–237.[31] The harvesting was conducted at the direction of the company's president, John Campbell. (McLaughlin, Tr. 8/16/94 at 196.)

54. Pacific Lumber conducted logging on five separate areas of THP–237 from Friday, June 19, 1992 until Tuesday, June 23, 1992, when operations were halted at the request of the CDF. (*Id.* at 201–02; Pls.' Ex. 64; Moore, Tr. 8/17/94 at 151; Herman, Tr. 9/6/94 at 143.) Pacific Lumber's logging manager, Dan McLaughlin ("McLaughlin"), testified that logging over a weekend was highly unusual. In fact, McLaughlin testified that in his sixteen years with the company, Pacific Lumber's logging crews never worked on a Sunday except in the case of fire, flood or heavy snowfall. (McLaughlin, Tr. 8/16/94 at 198–99.) More importantly, many of the areas harvested in THP–237 in June 1992 were immediately adjacent to survey stations where several detections of marbled murrelets were recorded between April and early June, including Stations 10, 13 and 14 in the proposed harvest area, and Station 15, where "occupied behavior" was observed by Denison on April 30, 1992. (Pls.' Exs. 64, 255 and 285.)

55. At the request of the DFG, Pacific Lumber resumed marbled murrelet surveys in THP–237 after the June 1992 harvest. (Moore, Tr. 8/17/94 at 152.) Whereas 70 marbled murrelet detections were recorded prior to the June 1992 harvest, only six detections were recorded in the month after the harvest. (*Id.* at 151–52.) None of these detections were recorded in the areas that Pacific Lumber harvested the previous month. (Pls.' Ex. 292.)

56. After the June 1992 harvest, Pacific Lumber added two survey stations, Stations 20 and 21, along a road that bisects the proposed retention area in the southwestern of portion of THP–237. (Pls.' Ex. 285.) This was the first time that Pacific Lumber placed survey stations in the southwestern portion of the Owl Creek forest, which is the closest part of the forest to the sea, and the direction where one would expect a marbled murrelet to come from on its journey to its nest. All of Pacific Lumber's post-harvest detections in Owl Creek during the remainder of the 1992 survey season were recorded in the vicinity of these two stations. (Pls.' Ex. 292.)

57. On July 1, 1992, NRM surveyor William Goggin ("Goggin") recorded one detection of three marbled murrelet vocalizations at a point 200 meters to the west of Station 21. (*Id.*) On the same morning, NRM surveyor Maya Conrad ("Conrad") recorded one detection of six marbled murrelet vocalizations to the north and west of Station 20, which is near the western edge of the proposed retention area.[32] (*Id.*)

58. On July 10, 1992, Fortna recorded three alternating marbled murrelet vocalizations at Station 21. (*Id.*) According to Fortna, the birds were detected approximately 200 meters to the west and below Station 21

THP–237, nor were any consultations held regarding the survey results.

**31.** Moore received Miller's letter on Saturday, June 20, 1992, the day *after* harvesting began, and immediately sent a response to Pacific Lumber via facsimile. (Moore, Tr. 8/17/94 at 127–29, 132–33; Pls.' Ex. 10.) On that Saturday, Moore was not aware that harvesting operations had begun the day before in THP–237, and he did not

become aware of it until he was called in from the field on Monday, June 22, 1992 to discuss the logging. (*Id.* at 130, 150–51.)

**32.** Despite the PSG Protocol's recommendations that surveyors should avoid placing survey stations near loud noise sources, both Goggin and Conrad indicated that creek noise in the vicinity of Stations 20 and 21 had an adverse impact on their surveys. (Pls.' Ex. 292.)

in the creek drainage. (*Id.*) Fortna's description places the marbled murrelets at a point below the canopy in the heart of the proposed retention area of THP–237. (Def's. Ex. 841.) This indicates that the proposed retention area of THP–237 is "occupied" by the marbled murrelet. (Pls.' Ex. 273 at 13.)

59. Finally, on July 14, 1992, Fortna detected a single marbled murrelet calling from a point approximately 300 meters south of Station 16, which would place the bird just south of Station 20 in the proposed retention area. (Pls.' Ex. 292.) Fortna's July 14, 1992 detection, as well as the other July 1992 detections in the vicinity of Stations 20 and 21, support a finding that the proposed retention area of THP–237 is "occupied" by the marbled murrelet.

60. At the end of the 1992 survey season Pacific Lumber's Resource Manager, Thomas Herman ("Herman"), hosted a party at his home for Pacific Lumber's forestry staff, which included the company's marbled murrelet surveyors.[33] (Miller, Tr. 8/16/94 at 186.) At the party, there was a target of a marbled murrelet on a dart board, at which the attendees were throwing darts. (*Id.*)

61. On September 28, 1992, the marbled murrelet was listed as a "threatened species" under the ESA. 57 Fed.Reg. 45328 (Oct. 1, 1992). During October and November of 1992, Pacific Lumber was informed by various employees of the USF & WS that logging in Owl Creek pursuant to THP–237 would likely cause a "take" of the marbled murrelet in violation of the ESA. (Pls.' Exs. 85, 309 and 333.)

62. On November 24, 1992, the eve of the Thanksgiving holiday, Pacific Lumber again began logging THP–237 at the direction of its president John Campbell. (McLaughlin, Tr. 8/16/94 at 199, 202.) During the trial, Pacific Lumber's logging manager, Dan McLaughlin, testified that one of the reasons the company conducted logging operations in THP–237 over the holiday weekend was because of the company's fear that it "might be stopped again." (*Id.* at 200.) In fact, Thanksgiving 1992 was the only time that

Pacific Lumber's logging crews had worked on a Thanksgiving weekend in McLaughlin's sixteen years with the company, and THP–237 was the only area logged by those crews on Friday, November 27, 1992, and Saturday, November 28, 1992. (*Id.* at 199–201.)

#### 4. *1993*

63. During the 1993 survey season, Pacific Lumber concentrated most of its survey efforts in the southwestern portion of the Owl Creek stand. Not surprisingly, many of the marbled murrelet detections recorded in 1993 were observed in this portion of the forest. In addition, Pacific Lumber failed to conduct marbled murrelet surveys at Owl Creek for a period of 71 consecutive days. (Moore, Tr. 8/18/94 at 90–91.) This was clearly a violation of the PSG Protocol. (Pls.' Ex. 274 at 5.) Nevertheless, there were significant detections of marbled murrelets in THP–237 during 1993.

64. On April 16, 1993, WRM surveyor Erin O'Bryan ("O'Bryan") recorded a visual detection of two marbled murrelets circling 20 meters above the canopy at Station 21, which is in the proposed retention area of THP–237. (Pls.' Ex. 280.) According to O'Bryan, the murrelets flew directly over the canopy at Station 21, heading from the southeast to the west. (*Id.*) According to the 1993 PSG Protocol, circling above the canopy is considered "occupied behavior;" however, the protocol recommends additional surveys depending on the height of the birds above the canopy and distance from potential habitat. (Pls.' Ex. 274 at 12.) In this case, two marbled murrelets flew directly over suitable habitat at a height of only twenty meters. This provides strong evidence that the southwestern portion of the Owl Creek stand is "occupied" by the marbled murrelet.

65. On July 1, 1993, five surveyors conducted Pacific Lumber's first search for marbled murrelet eggshell fragments in Owl Creek. (Def's. Ex. 838 at 5–6.) The surveyors searched the ground in the vicinity of Station 20 for two and one-half hours, with no success. (*Id.*)

---

**33.** Herman is also the person who was ultimately responsible for the conduct of Pacific Lumber's

marbled murrelet surveys in THP–237.

66. On July 7, 1993, four Pacific Lumber surveyors conducted a search for marbled murrelet eggshell fragments on a strip of land approximately 120 feet wide and 300 meters long between Stations 6 and 7, which are located to the north of THP–237 on the opposite bank of the Owl Creek. (Pls.' Ex. 284.) The surveyors searched the ground around 70 trees for two hours, with no success.[34] (Id.)

67. On July 14, 1993, another Pacific Lumber crew conducted ground searches in the vicinity of Stations 16 and 21, once again without success. (Def's. Ex. 838 at 3–4.) One of the surveyors, however, indicated that the area of the search was not very good habitat for the marbled murrelet. (Id. at 4.)

68. On July 25, 1993, WRM surveyor Jeff Steinman ("Steinman") recorded 11 detections of 14 marbled murrelets vocalizing and circling above and below the canopy at Station 20, which is to the southwest of Station 21 in the proposed retention area of THP–237. (Pls.' Ex. 279.) According to Steinman, two marbled murrelets flew 50 feet below the canopy heading from the east to the north; one marbled murrelet flew 50 feet below the canopy heading from the south to the northeast, which is in the direction of the proposed harvest area; two marbled murrelets were observed circling at the top of the canopy (150 feet); and five marbled murrelets were observed flying just at or above the top of the canopy (150 feet). (Id.) According to the 1993 PSG Protocol, circling below the canopy provides some of the strongest evidence that a stand is "occupied." (Pls.' Ex. 274 at 12.) Given the large number of marbled murrelets observed flying at or below the canopy level of Station 20 on July 25,

1993, there can be no question that the southwestern portion of the Owl Creek stand is "occupied" by the marbled murrelet.

### 5. *1994*

69. On June 15, 1994, four marbled murrelets were observed flying just over the top of the canopy at Station 16, which is located on the southwestern edge of the Owl Creek stand adjacent to the proposed retention area of THP–237. (Pls.' Ex. 261 at 20.) According to the surveyor, Nick Matthews, three murrelets flew directly overhead from east to west, heading from the direction of the proposed retention area to the sea. (Id. at 21.) One other murrelet flew over the canopy from the northeast to the southwest, heading from the direction of the proposed harvest area to the sea. (Id.)

70. On July 11, 1994, a WRM surveyor recorded two detections of 13 "overlapping" marbled murrelet vocalizations from a stationary position located 150 meters to the southwest of Station 21, which is in the proposed retention area of the stand. (Def's. Ex. 830.) This indicates that the marbled murrelets were calling from a stationary position in the stand, which is classified as "occupied behavior." (Pls.' Ex. 277 at 13.)

71. On the same day, WRM surveyor Michael Penney ("Penney"), observed a pair of marbled murrelets flying below canopy level at Station 6, which is immediately to the north of the proposed harvest area of THP–237. (Penney, Tr. 8/18/94 at 107–09; Pls.' Ex. 290; Kerns, Tr. 9/7/94 at 15.) According to Penney, the marbled murrelets were flying from the southeast, directly out of the proposed harvest area of THP–237, to the northeast.[35] (Penney, Tr. 8/18/94 at 108;

---

34. It is not surprising that the surveyors failed to find eggshell fragments in the vicinity of Station 7. There has never been a marbled murrelet detection recorded at Station 7. In fact, some of the Pacific Lumber surveyors who have visited the site have commented that it is questionable marbled murrelet habitat because of its elevation, the presence of corvids, and almost complete canopy closure. (Pls.' Exs. 292–A, 292–C, 292–P and 292–S.)

35. During the trial, Penney testified that, after he was finished surveying at Station 6 on July 11, 1994, he was called at home by Tad Diaz ("Diaz"), the head supervisor for WRM's Mar-

bled Murrelet Team, and told that he would have to go back to Station 6 the following day to "review" his detection. (Id. at 113–14.) According to Penney, Diaz told him the detection was "a real big deal" and "the lawyers would be all over this." (Id.) On July 12, 1994, Penney was made to revisit the site and write out a narrative of his detection. (Id. at 119–22; Pls.' Exs. 278, 290 and 291.) During the drive back to Station 6, Diaz told Penney there was "politics" involved in the marbled murrelet study at THP–237 and "there's a lot of money tied up in this stand." (Penney, Tr. 8/18/94 at 117–18.) While at Station 6, Diaz informed Penney that ground searches would be conducted in the area of Sta-

Pls.' Ex. 290.) Under the 1994 PSG Protocol, Penney's detection indicates that the proposed harvest area of THP–237, which is adjacent to Station 6, is "occupied" by the marbled murrelet.[36] (Pls.' Ex. 277 at 13.)

72. On July 14 and July 21, 1994, Pacific Lumber conducted ground searches for marbled murrelet eggshell fragments to the north and south of Station 6. (Def's. Ex. 838 at 7–8.) A total of 18 surveyors searched the area for three and one-half hours, without success. (*Id.*)

73. Pacific Lumber stopped surveying for marbled murrelets in Owl Creek after July 21, 1994.

### F. THP–237 is "Occupied" by the Marbled Murrelet

74. After carefully reviewing all of the evidence, and weighing the credibility of the witnesses, the court finds that EPIC has proven, by a preponderance of the evidence, that THP–237 is "occupied" by the marbled murrelet. That is, EPIC has proven, by a preponderance of the evidence, that marbled murrelets are nesting in THP–237.

75. Under the PSG Protocol, the test for determining whether a stand of potential habitat is "occupied" is simple: if a surveyor detects marbled murrelets during a survey visit *and* observes "occupied behavior," the

entire stand is classified as "occupied." (Pls.' Ex. 277 at 12–13, 29.) EPIC has proven that THP–237 satisfies this test.

76. First, EPIC has established that THP–237 is suitable habitat for the marbled murrelet. It has been classified as such by EPIC's expert witnesses, the PSG Protocol, the USF & WS Marbled Murrelet Recovery Team, and by Pacific Lumber itself in its map of the most suitable nesting habitat for the marbled murrelet on company property.[37] (Moore, Tr. 8/17/94 at 158; Nelson, Tr. 8/16/94 at 86; Burkett, Tr. 8/18/94 at 185, 262–65; Pls.' Ex. 248 at 2–3; Pls.' Ex. 277 at 3; Pls.' Ex. 329.)

77. Second, Pacific Lumber's survey records from 1992, 1993 and 1994 demonstrate that numerous instances of "occupied behavior" have been observed in and around THP–237, in both the proposed harvest area and the proposed retention area. (Nelson, Tr. 8/16/94 at 62.) Therefore, in accordance with the PSG Protocol, THP–237 is properly classified as an "occupied site." (Pls.' Ex. 277 at 13.)

78. It is important to remember that the marbled murrelet is an elusive species, and relatively few murrelets remain in the at-sea population off south central Humboldt County. This means that *any* detection of a marbled murrelet at a stand of suitable habitat in

---

tion 6, but he said "we'll probably lose our contract if we find anything." (*Id.* at 132–33.) Penney was also told not to tell anyone of his conversation with Diaz. (*Id.* at 122.) In spite of what was obviously an attempt on behalf of Pacific Lumber to encourage Penney to reconsider his July 11, 1994 detection, Penney's account of this detection has never wavered. (*Id.* at 120.)

**36.** One week after Penney observed the marbled murrelets flying below the canopy at Station 6, Penney detected the bird's distinctive wing beats, another indication of "occupied behavior," while surveying in Owl Creek. (Penney, Tr. 8/18/94 at 111–13.) Penney indicated this detection on his survey form, however, when attempted to hand in the form to WRM, he was told by his supervisor, John Eldridge, that he was not allowed to write down a detection unless he actually saw a marbled murrelet or heard it vocalizing. (*Id.*) Penney had to fill out a second survey sheet, this time omitting any reference to his detection of the marbled murrelet's distinctive wing beats. (*Id.*)

**37.** During the trial, Pacific Lumber's expert witnesses, Speich and Kerns, maintained that the proposed harvest area of THP–237 contained less suitable habitat for the marbled murrelet than the proposed retention area. (Speich, Tr. 9/8/94 at 47, 54, 64–65; Kerns, Tr. 9/7/94 at 47–48, 101.) Their testimony on this issue, however, is entirely contradicted by Pacific Lumber's HCP, which Speich and Kerns helped prepare for the company, and Pacific Lumber's map of the most suitable nesting habitat for the marbled murrelet on company property. (Pls.' Exs. 329 and 334.) The map, which was produced for the first time on September 7, 1994, the second to last day of the trial, identifies the proposed harvest area of THP–237 as some of the most suitable habitat for the marbled murrelet on Pacific Lumber's property. (Speich, Tr. 9/8/94 at 146–52; Pls.' Ex. 329.) The proposed retention area, however, is classified as less suitable than the proposed harvest area. (Pls.' Ex. 329.) After carefully comparing the testimony of Speich and Kerns with Pacific Lumber's map and HCP, the court finds that the testimony of Speich and Kerns on the issue of suitable habitat lacks credibility.

south central Humboldt County is significant. Add to this the remoteness of the Owl Creek stand, as well as its isolation from other suitable habitat, and the detections of marbled murrelets at THP–237 begin to take on greater significance.

79. In this case, there have been approximately 100 detections of marbled murrelets at Owl Creek, throughout the birds' breeding season, for a period of three consecutive years. It is reasonable to conclude that there can be only one explanation for the marbled murrelets' continued presence in Owl Creek: the marbled murrelet is using the Owl Creek stand for nesting purposes. As Pacific Lumber states in its HCP:

> There is every reason to believe that during the spring and early summer, when activity levels are lower, that largely nesting birds are being detected during morning observation periods. This is the period when most birds are incubating eggs, attending newly hatched young, and starting into the nestling period. The period when detection rates increase, often dramatically, is when most nests contain nestlings.

(Pls.' Ex. 334 at V–4.)

80. During the trial, Pacific Lumber attempted to minimize the significance of its marbled murrelet detections by arguing that the quantity of detections, especially detections of "occupied behavior," was too low, when compared to the number of hours spent surveying, for the finder of fact to conclude that THP–237 is "occupied" by the marbled murrelet. Pacific Lumber's expert witnesses, Speich and Kerns, opined that the significant number of "no detections" recorded by Pacific Lumber's surveyors, coupled with the lack of observations of behaviors closely associated with nesting, leads them to conclude that THP–237 is not "occupied" by the marbled murrelet. (Speich, Tr. 9/8/94 at 74–75; Kerns, Tr. 9/7/94 at 47–48, 52–56, 91–94.) The opinions of Speich and Kerns are entirely dependent upon the integrity of Pacific Lumber's surveys, or more accurately, that portion of Pacific Lumber's survey data which indicates that marbled murrelets were not detected in THP–237. As will be discussed below, this portion of Pacific Lumber's surveys is patently unreliable.

81. Pacific Lumber's "no detections" argument unsuccessfully attempts to sidestep a fundamental flaw in the manner in which Pacific Lumber has dealt with the task of evaluating the potential presence of marbled murrelets in Owl Creek. Quite simply, Pacific Lumber's marbled murrelet surveys were not conducted by an independent and impartial third party using the scientific method to determine whether the Owl Creek stand is occupied by the marbled murrelet. Instead, Pacific Lumber's marbled murrelet surveys in Owl Creek were conducted by surveyors, who to a considerable extent were Pacific Lumber employees, and all of whom were under the direct supervision of Pacific Lumber's top and middle management, whose understandable loyalty to Pacific Lumber extended to the harvesting of THP–237 as the desired company goal. As Thomas Herman, the head of Pacific Lumber's forestry operations, stated during the trial: "Our intention in running our business is to grow and harvest trees. Just about anything we do is intended to cut and grow trees." (Herman, Tr. 9/6/94 at 174.) Herman admitted that the purpose of Pacific Lumber's marbled murrelet surveys was to let the company continue its harvest operations. (*Id.*) Pacific Lumber displayed its commitment to harvesting trees at all costs when it logged THP–237 in June and November 1992, contrary to the conditional approval it had received from the Board of Forestry just a few months before, and despite mounting evidence that Pacific Lumber had in its possession that the stand was occupied by the marbled murrelet. In this case, Pacific Lumber's bold pursuit of its intention "to cut and grow trees" renders the objectivity of its survey results highly suspect.

82. Additionally, there is sufficient evidence in the record for the court to find that Pacific Lumber administered its marbled murrelet surveys at THP–237 with the intent to either avoid detecting marbled murrelets or, to the extent that making detections could not be helped, to grossly understate the marbled murrelets' presence in THP–237. Despite the Board of Forestry's expressed condition of approval, Pacific Lumber's marbled murrelet surveys were never conducted in

accordance with the PSG Protocol. Moreover, Pacific Lumber's utilization of the following methods to conduct marbled murrelet surveys at THP–237 provides clear evidence that the company's marbled murrelet surveys were either designed to fail to detect murrelets, or they were administered with indifference as to whether the required procedure would be used or not:

(a) Pacific Lumber's employees decided where the survey stations would be located and when they would be manned;

(b) only four survey stations were located in the proposed harvest area itself, and only two survey stations were located on the western edge of THP–237—the direction from which the birds could be expected to fly from the sea and into the stand;

(c) in direct contradiction to the PSG Protocol, survey stations were located near loud noise sources, and a substantial number of surveys were conducted in adverse weather conditions, which were known to inhibit the surveyors' ability to detect murrelets;

(d) in 1992, Pacific Lumber harvested in THP–237 during the middle of the nesting season, at the very beginning of the peak period for marbled murrelet detectability;

(e) in 1993, 71 consecutive days were allowed to elapse between surveys;

(f) despite the fact that Pacific Lumber's surveyors were trained to be able to audibly detect the marbled murrelet, and were certified by the State of California as being able to do so, Pacific Lumber's survey managers instructed the company's field surveyors that they were not to record detections of single marbled murrelet "keer" calls, or detections of the marbled murrelets' distinctive wing beats or "jet sounds;"

(g) two surveyors who recorded visual detections were interrogated by their supervisors, on the surveyors' own time, under circumstances that appear to have been calculated to persuade the surveyors to change or delete marbled murrelet detections that were contrary to Pacific Lumber's interests; and

(h) Pacific Lumber never conducted ground searches for eggshell fragments in THP–237 until July 1993, and it never conducted ground searches in the proposed harvest area until July 14, 1994, after Penney observed two marbled murrelets flying below the canopy level at Station 6.

83. The weakness of Pacific Lumber's "no detection" argument is further demonstrated by the fact that Pacific Lumber has never fully complied with the Board of Forestry's requirement that it "share" information obtained from its marbled murrelet surveys with the DFG to ensure that a "take" of the marbled murrelet will not occur during harvesting. Pacific Lumber did not provide survey data sheets for the 1992 survey season to the DFG until approximately July 31, 1992, more than one month after the company surreptitiously logged THP–237.[38] (Moore, Tr. 8/17/94 at 149.) Pacific Lumber revealed for the first time during the trial that the survey data sheets it turned over to the DFG on July 31, 1992 were not the original survey data sheets completed by the company's field surveyors at the time they conducted their surveys.

84. On the second day of the trial, August 16, 1994, Pacific Lumber revealed for the first time that its two principal survey contractors kept two different sets of survey data sheets for the marbled murrelet surveys conducted in THP–237 during 1992. (Tr. 8/16/94 at 147–50.) The first set of survey sheets, which Pacific Lumber characterized as the "original" survey sheets, were completed by NRM's certified marbled murrelet surveyors in the field at the time they conducted their surveys. (Id. at 147–48.) According to Pacific Lumber, NRM turned over the original survey sheets to Pacific Lumber's primary survey contractor, WRM; WRM "replicated" the original data onto a second set of survey sheets; and Pacific Lumber turned over the second set of sheets to the DFG on July 31, 1992. (Id.) Pacific Lumber, however, never produced the original 1992 survey data sheets until the second

---

**38.** David Fortna's June 8, 1992 "jet sound" data sheet was never provided to the DFG, and the DFG was not informed of its existence; instead, the DFG was given the substitute form filled in by Miller which incorrectly indicated that "no detections" had been made. (Miller, Tr. 8/16/94 at 167–69.)

day of the trial, more than two years after they were originally completed. (*Id.*; Pls.' Exs. 292 and 293.) During the trial, Kerns testified that the original survey sheets were recently uncovered in his closet at home, which he referred to as WRM's "archives." (Kerns, Tr. 9/7/94 at 39.)

85. Further examination of the original NRM survey sheets reveals that Pacific Lumber did more than merely "replicate" data from one set of survey sheets to another. Many of the original NRM survey sheets contain pertinent information which may have helped the DFG evaluate the validity of Pacific Lumber's surveys and the impact that harvesting THP–237 would have on the marbled murrelet, including: field surveyors' references to adverse weather conditions which may have had an adverse impact on survey efforts; detections of predators such as ravens, stellar jays and hawks in and around THP–237; the degree of canopy coverage at the survey stations; characteristics of the old-growth at the site; and surveyors references to whether the portion of the stand that they were surveying was suitable nesting habitat for the marbled murrelet. (Pls.' Ex. 292.) Nearly all of these comments were deleted or altered before the data was "replicated" onto the second set of survey sheets

that Pacific Lumber submitted to the DFG.[39] (Pls.' Ex. 292–A–T.)

86. Pacific Lumber's performance concerning the reworking and withholding of the original survey data sheets materially weakens the "no-detection" premise that Speich and Kerns rely on for their opinions concerning occupancy. Consequently, these opinions are not sufficiently persuasive to dislodge a finding that EPIC has satisfied its burden of proof.

87. Finally, the court finds that Pacific Lumber's expert witnesses, Speich and Kerns, lack objectivity and credibility. Both Speich and Kerns have been paid substantial sums of money to conduct marbled murrelet research on behalf of the company, and to act as advocates for Pacific Lumber in various forums. Since 1990, Pacific Lumber has paid Kerns' firm, WRM, nearly one million dollars to conduct marbled murrelet surveys and research for the company.[40] (Tr. 9/8/94 at 161–62.) In addition, Kerns has participated in Pacific Lumber's interaction with state and federal agencies regarding the company's efforts to oppose the listing of the marbled murrelet as a protected species, to harvest THP–237, and to obtain an "incidental take" permit for the marbled murrelet.[41]

---

**39.** For example, while surveying at Station 10 on April 30, 1992, NRM surveyor Sean McAllister recorded two audible detections of marbled murrelets engaging in unknown behavior at a height of 50 meters. (Pls.' Ex. 292–Q.) McAllister noted on his original survey sheet that "[h]eavy fog, nearby creek noise may have affected further detections." (*Id.*) McAllister's original notation was changed to "heavy fog, creek noise" on the survey sheet that Pacific Lumber submitted to the DFG and EPIC. (Pls.' Ex. 293–Q.) Similarly, on the same day, NRM surveyor Dirk Embree recorded seven audible detections of marbled murrelets at Station 14. (Pls.' Ex. 292–T.) Embree indicated on his original survey sheet that the murrelets were "fairly close, but in fog." (*Id.*) He also noted: "Foggy, rainy, windy, near creek, all these had definite impact on survey." (*Id.*) Embree's notations were altered in the sheet that Pacific Lumber turned over to the DFG. In what is obviously different handwriting, the note section on the second survey sheet was changed to read: "[birds] way up in fog. . . . The fog, rain, wind all had an impact on detections. Visibility as low as 100m." (Pls.' Ex. 293–T.) Also, after surveying at Station 11 on June 2, 1992, McAllister noted on his original survey sheet: "Mature stand of Redwood and Douglas Fir, 2′–8′ dbh[.] Good MaMu nest char-

acteristics but NO DETECTIONS[.]" (Pls.' Ex. 292–M.) McAllister also noted the presence of a stellar jay. (*Id.*) During Pacific Lumber's "replication" process, McAllister's notations about the stand's characteristics and the presence of a predator species were deleted. (*Id.*) The survey sheet that Pacific Lumber turned over to the DFG simply indicated that McAllister made "NO DETECTIONS." (*Id.*) Stations 10, 11 and 14 are all in the proposed harvest area.

**40.** This figure does not include any money which Pacific Lumber paid Kerns for appearing and testifying at trial. Additionally, WRM's marbled murrelet work has been performed exclusively for Pacific Lumber. (Kerns, Tr. 9/7/94 at 118–19.)

**41.** During the trial, Kerns denied that he has acted as an advocate for Pacific Lumber. However, during cross-examination, Kerns demonstrated a lack of objectivity when he complained about the DFG's lack of "sensitivity" to the economic realities of the logging industry. Kerns testified:

I think members of the Department lack sensitivity to the reality of what has to happen in

(Kerns, Tr. 9/7/94 at 153–58; Pls.' Exs. 96, 309 and 334.) Shortly before the marbled murrelet was listed as an "endangered species" by the State of California, Speich pitched his services as a "consultant" to Pacific Lumber's president, John Campbell, Kerns, and other Pacific Lumber officials, advising them to "get in front of the curve" on marbled murrelet research. (Speich, Tr. 9/8/94 at 38–41, 87.) Speich told Pacific Lumber's executives that "[i]f they want to be able to continue [to] harvest timber, they're going to have to be able to demonstrate [the] relationship of marbled murrelet to those timbers that they are projecting to harvest." (*Id.* at 41.) One of Speich's first assignments was to testify before the California Fish and Game Commission in opposition to the State of California's listing of the marbled murrelet as an "endangered species" under CESA. (*Id.* at 87–88.) Speich also submitted comments to the USF & WS criticizing the research upon which the federal listing of the marbled murrelet as a "threatened species" is based. (*Id.* at 88–89.) Since 1992, Pacific Lumber has paid Speich's consulting firm in excess of $250,000.00 for Speich's work regarding the marbled murrelet.[42] (*Id.* at 119–20.) Also, Speich's recent publications on the marbled murrelet have been funded either by Pacific Lumber or by the paper industry. (*Id.* at 92–93.)

88. Additionally, the expert reports of both Speich and Kerns were written with substantial input from Pacific Lumber's attorneys. Kerns repeatedly sought guidance from Pacific Lumber and its attorneys in crafting his expert report. (Kerns, Tr. 9/7/94 at 112–14.) After meeting with Pacific Lumber's attorneys, Kerns drafted and initial expert report which contained a series of outlines and proposed conclusions. (*Id.* at 112–13.) Kerns faxed his draft report to Pacific Lumber's attorneys and asked them "How much flesh should be hung on the bones?"

(*Id.* at 113–14.) Kerns also reviewed and edited Speich's expert report. (*Id.* at 114.) Similarly, Pacific Lumber's attorneys gave Speich detailed instructions about what he should state in a sworn declaration that Pacific Lumber submitted to the California Court of Appeals in opposition to a temporary stay that the court had issued against THP–237. (Speich, Tr. 9/8/94 at 133–37; Pls.' Ex. 333.) In a letter dated December 1, 1992, Pacific Lumber's attorney, Frank Bacik, stated:

> [T]he declaration should be simple and direct, stating that under your review of the facts and circumstances the Owl Creek plan area is not an active murrelet site or "occupied" by murrelets that will be directly "taken." ... In general, it should say that there is no proof, and you do not believe that there is available adequate evidence or proof, to establish that implementation of the plan will kill or injure murrelets or otherwise pose a devastating risk to the continued existence of the species; that they cannot be annoyed if they are not present; that they will not be present during the non-breeding season (winter).

(Pls.' Ex. 333.) The testimony of Speich and Kerns during the trial in this case was *identical* to the declaration proposed by Bacik in 1992.

■ 89. As the Ninth Circuit recently stated in *Daubert:*

> One very significant fact to be considered [in the context of the court deciding whether to admit expert testimony] is whether the experts are proposing to testify about matters growing naturally and directly out of research that they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. That an expert

---

the field when they ask for certain mitigations and certain research projects.... I think what they fail to realize at times is that when you are not supported by the government and you have to earn your own living, you have to run in the black. And that ... you have to produce something from the ground to do that. If you demand so much from them that you put them in the red, you will put them out of

business. And I think a state agency should be receptive to that. And I'm speaking not as a biologist, but [as] a citizen of this state who has witnessed a hardship in our area because a lot of people have gone out of business.
(Kerns, Tr. 9/7/94 at 162–63.)

**42.** This figure does not include money paid to Speich for appearing and testifying at trial.

testifies for money does not necessarily cast doubt on the reliability of his testimony, as few experts appear in court merely as an eleemosynary gesture. But in determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is in the lab or the field, not the courtroom or the lawyer's office.

*Daubert,* 43 F.3d at 1317. This standard is equally applicable when weighing the credibility of an expert witness after he has testified. In this case, the court may not ignore the fact that the primary experience that Speich and Kerns have had with the marbled murrelet has grown out of their involvement with Pacific Lumber, for which they have been paid presumably fair and full compensation; that their trial testimony, which contradicted the generally accepted scientific knowledge about the marbled murrelet, appears to have been crafted by Pacific Lumber's attorneys; and that Speich and Kerns have acted as advocates for Pacific Lumber in a variety of forums, including during the trial in this case. For these reasons, the court finds that Speich and Kerns lack objectivity and credibility.

90. In sum, the court finds that there have been sufficient observations of "occupied behavior" in and around THP–237 for the court to conclude that the Owl Creek stand is "occupied" by the marbled murrelet. *See, infra,* Section II–E. Pacific Lumber's attempt to minimize the significance of these detections is not persuasive because its evidence merely shows a variety of efforts by the company to avoid, or at least to discourage, the inevitable recording of detections of marbled murrelets, and to understate the importance of detections that are recorded. The other evidence of nearly 100 detections, however, has demonstrated that these efforts failed. Finally, the opinions of Pacific Lumber's expert witnesses regarding the marbled murrelets' occupancy of THP–237 are unreliable, principally because they are dependent upon Pacific Lumber's discredited claims that marbled murrelets do not inhabit THP–237, all of which have been shown to be based on Pacific Lumber's survey methods and reporting of survey data which are unreliable.

### H. Pacific Lumber's Implementation of THP–237 would both "Harm" and "Harass" the Marbled Murrelet

91. Under the ESA, it is illegal for any person to "take" any endangered species of fish or wildlife within the United States or the territorial sea of the United States.[43] 16 U.S.C. § 1538(a)(1)(B). The ESA defines "take" as follows:

> The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

16 U.S.C. § 1532(19).

92. The USF & WS has defined the word "harass" in the ESA's definition of "take" as:

> an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering.

50 C.F.R. § 17.3 (1993).

93. The USF & WS has defined the component term "harm" as:

> an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

*Id.*

94. EPIC has demonstrated that Pacific Lumber's implementation of THP–237 will sufficiently "harm" and "harass" the marbled murrelet to constitute a "taking" of the species in violation of 16 U.S.C. § 1538(a)(1)(B).

#### 1. Harm

95. The proposed harvest area of THP–237 lies at the approximate center of the Owl Creek stand. Logging activities on THP–237 according to the plan, as amended,

---

**43.** Pursuant to 50 C.F.R. § 17.31(a), threatened species are entitled to the same protection as endangered species. *See also* 16 U.S.C. § 1533(d).

will result in the destruction and degradation of occupied habitat, such that marbled murrelets will actually be killed or injured by the logging operations, or through significant impairment of their essential behavioral patterns. (Nelson, Tr. 8/16/94 at 70; Moore, Tr. 8/17/94 at 175–81.) Pacific Lumber's implementation of THP–237, which calls for the immediate removal of 40 to 60 percent of the old-growth redwood and Douglas fir trees in the proposed harvest area, will significantly impair the marbled murrelets' breeding behavior and decrease the chances of successful nesting. (Nelson, Tr. 8/16/94 at 69–73; Burkett, Tr. 8/18/94 at 262–65; Carter, Tr. 8/15/94 at 173–74.) Moreover, the harvesting of THP–237, or any other significant portion of the marbled murrelets' critical nesting habitat in southern Humboldt County, will result in a high probability that the remaining population of marbled murrelets in this region will become extinct. (Carter, Tr. 8/15/94 at 91–96; Pls.' Exs. 270 and 271.) The survivability of the marbled murrelet population utilizing Owl Creek is important to the survivability of the entire California marbled murrelet population, because the loss of this population will result in the loss of the marbled murrelet population throughout a significant portion of its range. (Carter, Tr. 8/15/94 at 94–95; Pls.' Exs. 270 and 271.)

96. Removing more than half of the trees in the 137 acre harvest area will result in the loss of a substantial portion of the nesting opportunities for marbled murrelets returning to the harvest area. (Moore, Tr. 8/17/94 at 154, 166.) The retention of a relatively small portion of suitable marbled murrelet habitat within the stand will not reduce the impact of the harvesting of THP–237 to a level of insignificance. Given the immensity of the old-growth trees, the felling of any one tree inevitably causes damage to other trees around it, and the harvest of any one part of the stand will degrade the suitability of the entire stand as nesting habitat for marbled murrelets. (*Id.* at 154–55.)

97. Since marbled murrelets return to the same tree or groups of trees in consecutive years, the harvest of half of the trees in the center of the stand will likely cause returning marbled murrelets to become disoriented and significantly decrease the likelihood that they will be able to successfully nest and raise their young to fledgling. (Nelson, Tr. 8/16/94 at 70–71.) If THP–237 is implemented, marbled murrelets returning to the Owl Creek stand will be subject to increased competition for the few remaining nest sites, and some individual marbled murrelets will likely fail to find nest sites. (*Id.*)

98. The remaining Owl Creek stand will be much more open and fragmented, a condition that will increase the likelihood of avian predation upon the remaining marbled murrelets who achieve nesting, their eggs, and their young. (Burkett, Tr. 8/18/94 at 263–64; Carter, Tr. 8/15/94 at 111.) In fact, an examination of the original NRM survey sheets from the 1992 survey season reveals that a number of marbled murrelet predators have been detected in and around the Owl Creek stand, including in the harvest area itself.[44] (Pls.' Ex. 292.)

99. The loss of canopy which will occur if THP–237 is implemented will force returning murrelets to attempt to nest in the degraded nest sites, or be forced to attempt nesting in substandard habitat. (Burkett, Tr. 8/18/94 at 264–65; Moore, Tr. 8/18/94 at 59.) Nesting in substandard habitat will also subject the marbled murrelet to increased risk of avian predation. (Burkett, Tr. 8/18/94 at 265.) It is also quite possible that marbled murrelets faced with nesting in substandard habitat will simply choose not to nest. (*Id.*)

100. While marbled murrelets fly inland in greater numbers during the nesting season, there is evidence that murrelets visit inland sites year-round. (Nelson, Tr. 8/16/94 at 20–21, 28 and 50; Carter, Tr. 8/15/94 at 109, 131; Speich Tr. 9/8/94 at 67.) Therefore, it is likely that marbled murrelets use THP–237 and the Owl Creek forest during non-nesting times of the year. (Carter, Tr. 8/15/94 at 109.) Year-round use of inland

---

44. One NRM surveyor even noted that he observed a northern spotted owl being "mobbed by stellar jays as it came out of the clear cut area to the north" of THP–237. (Pls.' Ex. 292, Station 2, June 9, 1992.)

sites is documented in the region. (Nelson, Tr. 8/16/94 at 50; Speich, Tr. 9/8/94 at 67.) Consequently, the court finds that the proposed logging of THP–237, even outside of the nesting season, will "harm" the marbled murrelet by destroying its critical nesting habitat. (Burkett, Tr. 8/18/94 at 270.)

### 2. *Harass*

■ 101. Implementing the proposed timber harvest plan during the breeding season creates the likelihood of injury to marbled murrelets by annoying them to such an extent that it will significantly disrupt their normal behavioral patterns. (Nelson, Tr. 8/16/94 at 70.) This was clearly demonstrated by the precipitous decline in marbled murrelet detections at THP–237 in July 1992, after Pacific Lumber conducted logging operations at the beginning of what should have been the peak period for marbled murrelet detectability. (*Id.* at 67; Moore, Tr. 8/17/94 at 151–52.)

102. Pacific Lumber maintains that by harvesting THP–237 during the fall or spring, it will successfully avoid harassing murrelets because they are not in the stand. At this time, it is impossible to determine whether Pacific Lumber's argument is correct. Marbled murrelets are known to fly inland during the non-breeding season; however, no surveys have been taken in Owl Creek during this period. Nevertheless, in light of the court's finding that harvesting in Owl Creek at any time of the year will "harm" the marbled murrelet, the court will not lift the injunction to allow Pacific Lumber to harvest THP–237 during the non-breeding season.

### I. *Permanent Injunction*

103. In cases involving the ESA, Congress has removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests. *TVA v. Hill,* 437 U.S. 153, 173, 187–88, 98 S.Ct. 2279, 2291, 2298–99, 57 L.Ed.2d 117 (1978); *Sierra Club v. Marsh,* 816 F.2d 1376, 1383 (9th Cir.1987). In *TVA,* the Supreme Court stated that the "language, history, and structure" of the ESA demonstrates Congress' determination that the balance of hardships and the public interest tip heavily in favor of endangered species. *TVA,* 437 U.S. at 174, 187–88, 194–95, 98 S.Ct. at 2292, 2298–99, 2301–02. Thus, the court "may not use equity's scales to strike a different balance." *Marsh,* 816 F.2d at 1383.

■ 104. To prevail in an injunctive proceeding under the ESA, the plaintiff must show that "a violation of the ESA is at least likely in the future," or that there is "a definite threat of future harm to [a] protected species." *Burlington Northern,* 23 F.3d at 1512, n. 8. Future harm to a species need not be shown with certainty before an permanent injunction may issue, but "mere speculation" will not suffice. *Id.*

105. In this case, EPIC has demonstrated that Pacific Lumber's proposed implementation of THP–237 imposes a definite threat of future harm to the marbled murrelet. The harvesting of THP–237 will likely cause a violation of the ESA by sufficiently degrading the birds' critical nesting habitat to the extent that it will significantly impair marbled murrelets' essential behavioral patterns, including breeding, feeding and sheltering. Consequently, EPIC has demonstrated that a permanent injunction is warranted in this case.[45]

### III. *CONCLUSIONS OF LAW*

106. Pacific Lumber's implementation of THP–237 will "harm" the marbled murrelet as defined in 50 C.F.R. § 17.3, and thereby

---

**45.** Even under the traditional balancing of the equities test, EPIC has demonstrated that a permanent injunction is warranted in this case. Pacific Lumber may not be forever foreclosed from harvesting THP–237. If Pacific Lumber can establish through reliable surveys, conducted by an independent and impartial third party in strict compliance with the PSG Protocol, that THP–237 is not "occupied" by the marbled murrelet, it could seek to have the injunction lifted or modified. Also, Pacific Lumber could submit, and receive approval of, a habitat conservation plan in accordance with 16 U.S.C. § 1539(a)(2). Although Pacific Lumber has already submitted a draft HCP to the DFG and USF & WS, to the extent that this HCP is based on the survey techniques employed by Pacific Lumber at THP–237, the court believes that its reliability is highly suspect.

cause a "take" of the species in violation of 16 U.S.C. § 1538(a)(1)(B).

107. Pacific Lumber's implementation of THP–237 will "harass" the marbled murrelet as defined in 50 C.F.R. § 17.3, and thereby cause a "take" of the species in violation of 16 U.S.C. § 1538(a)(1)(B).

108. A permanent injunction prohibiting Pacific Lumber's implementation of THP–237 is warranted under 16 U.S.C. § 1540.

109. Plaintiffs are entitled to recover their costs, including reasonable attorney and expert witness fees, in accordance with 16 U.S.C. § 1540(g)(4).

## APPENDIX A

**(Excerpted from Plaintiffs' Exhibit 285 and Defendant's Exhibit 841, and directional arrow added for clarity)**